## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **SISTEMA INTEGRADO DE SALUD DEL OESTE, L.L.C., EAST COAST MEDICAL SERVICES INC., COSTA ESTE MEDICAL SERVICES, L.L.C., COSTA ESTE MEDICAL SERVICES CORP., & FAMILY MEDICINE GROUP INC.,** | Case No. _____ |
| Plaintiffs, | |
| v. | |
| **ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EXPRESS SCRIPTS, INC.; CAREMARKPCS HEALTH, LLC; and OPTUMRX INC.** | |
| Defendants | |

## <u>COMPLAINT</u>

1.      Plaintiffs Sistema Integrado de Salud del Oeste, L.L.C. ("SISO"), East Coast Medical Services Inc. ("ECMS"), Costa Este Medical Services, L.L.C. ("Costa, L.L.C."), Costa Este Medical Services Corp. ("Costa Corp"), and Family Medicine Group Inc. ("FMG") bring this action pursuant to the Puerto Rico Antitrust Act (the "PRAA"), 10 L.P.R.A. §§ 258, 260, 268, *et seq.*, to redress Defendants' anticompetitive, unlawful conduct in connection with the manufacture and sale of insulin products in Puerto Rico. As alleged further below, Defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. L.L.C. ("Sanofi") (collectively with Eli Lilly and Novo Nordisk, the "Manufacturing Defendants") have engaged in horizontal price-fixing and/or other unlawful combinations or agreements in restraint of trade with respect to their benchmark prices for the analog insulin products they produce.

1

Similarly, Defendants Express Scripts, Inc. ("Express Scripts"), CareMarkPCS Health, L.L.C. ("CVS CareMark"), and OptumRX Inc. ("OptumRX") (collectively with Express Scripts and CVS CareMark, the "PBM Defendants") have engaged in horizontal price-fixing and/or other unlawful combinations or agreements in restraint of trade by exerting leverage against each of the Manufacturing Defendants to provide similar "rebates" off the benchmark price for the Manufacturing Defendants' analog insulin prices to increase artificially the PBM Defendants' profits. Moreover, the Manufacturer Defendants and PBM Defendants have worked together to fix prices for analog insulin in Puerto Rico through (1) agreeing on high rebates that benefit the PBMs, that (2) are passed on largely to consumers and (as pertinent here) independent physicians associations ("IPAs")—Plaintiffs, included—that pay prices based on the artificially inflated benchmark prices. Each of these combinations—of the Manufacturing Defendants, of the PBM Defendants, and of the Manufacturing Defendants with the PBM Defendants together—is a violation of the PRAA for which Plaintiffs, as IPAs, are entitled to recover damages.

## INTRODUCTION

2.      Diabetes is a leading cause of death in Puerto Rico, and many of the nearly 500,000 Puerto Ricans who suffer from the condition depend on insulin to survive.

3.      Though insulin is nearly a century old and has been widely prescribed for decades, the price of this life-sustaining drug has skyrocketed in recent years, and it has done so exclusively in the United States markets (including Puerto Rico). In 2018, the cost for a vial of insulin averaged $98.70 in the United States, but only $6.94 in Australia, $7.52 in the United Kingdom, $9.08 in France, $11.00 in Germany, $12.00 in Canada, and $14.40 in Japan. Eli Lilly's Humalog, for example, sells for more than $300 in the United States, but costs only $30 in Canada. The price of insulin in the United States is, therefore, nearly ten-fold its price in the rest of the developed world.

2

4.      The staggering price differential of insulin in the United States (and specifically in Puerto Rico) is no accident, nor is it the product of legitimate market forces. Defendants have wielded their immense market power to artificially inflate the cost of insulin in the United States (and specifically in Puerto Rico) in violation of the PRAA.

5.      The Manufacturing Defendants manufacture nearly all of the insulin sold in the United States. The Manufacturing Defendants abuse their oligopolistic power to aggressively raise the list price of insulin in lockstep with one another. These price increases have exceedingly outpaced inflation and cannot be attributed to either improvements in the efficacy of the drugs or the cost of manufacturing them.

6.      The PBM Defendants are pharmacy benefit managers ("PBMs") that administer prescription drug programs and, in doing so, determine which prescription drugs are included on their drug "formularies," setting forth which drugs are covered by the drug plans they administer and, if so, at what price to the consumer (in the form of co-payments and other cost-sharing obligations). The PBM Defendants dominate the PBM market in the United States (including Puerto Rico), holding more than 75% of the market share, and inclusion of a prescription drug by the PBM Defendants on the plans they administer drives sales volume and revenue to the Manufacturing Defendants. The PBM Defendants leverage that market power in negotiating secret rebates that a Manufacturing Defendant will pay to the PBM Defendants—not individual consumers or IPAs—if an individual consumer fills a prescription for a drug manufactured by the Manufacturing Defendants.

7.      These secret rebates lead to perverse incentives. PBMs, which purport to exist for the purpose of lowering drug prices, actually pressure manufacturers like the Manufacturing Defendants into providing higher rebates in exchange for preferred placement on the PBMs drug

formularies (lists specifying drugs that can be purchased by individual consumers, and at what level of copay or coinsurance, in connection with a particular plan for which the PBM is acting). The Manufacturing Defendants in turn leverage their unchecked market power to increase the benchmark price of their analog insulin products to make up for the higher rebates. And all along, individual consumers and IPAs are paying amounts premised on the artificially inflated benchmark prices.

8.     In Puerto Rico, the effects of these artificially inflated and concerted prices are felt most by Plaintiffs, each of which is an IPA. The business models of IPAs like Plaintiffs are structured such that each IPA receives a set amount of money per beneficiary for a specific period of time (e.g., a quarterly period) that is referred to as a "capitation payment." The IPA then provides services on behalf of its beneficiaries, including (as pertinent here) payment to pharmacies for prescription drugs obtained by the IPA's beneficiaries. Each dollar spent by the IPA on benefits for its beneficiaries is deducted from the IPA's capitation payments. At the end of the specified period (e.g., the end of a fiscal quarter), the IPA either retains a portion of the remaining capitation as profit or, in the event the cost of benefits during that period exceeds the amount received as a capitation payment, bears a portion of the losses. The artificially inflated pricing for analog insulin set forth herein has "squeezed" capitation payments to Plaintiffs:  the profits to which the Plaintiffs might otherwise have been entitled have been diminished, and the losses the Plaintiffs have been required to bear have increased, both a result of the higher price of analog insulin. Plaintiffs are the end-purchasers of the analog insulin products and thus bear the burden of the artificially inflated prices themselves, without passing on those amounts to any other entity or person in the insulin distribution chain. Each Plaintiff has accordingly incurred hundreds

of thousands (and potentially millions) of dollars in damages from its purchase of each analog insulin product manufactured by the Manufacturing Defendants.

9.      Critically, the amounts paid by IPAs (like Plaintiffs) for analog insulin on behalf of their beneficiaries are calculated based on the benchmark pricing set by the manufacturers; IPAs do not share in the large rebates received by PBMs from manufacturers.

10.     In sum, and as set forth more fully below, (1) the PBMs and Manufacturing Defendants work together to increase the rebates paid to PBMs in exchange for more-favorable placement on the PBM Defendants' drug formularies; (2) as price-setting, oligopolistic firms, the Manufacturing Defendants are able to increase and maintain (and have increased and maintained) their prices to inflate their profits, while incorporating the higher rebates paid to the PBM Defendants; and (3) the higher prices charged by the Manufacturing Defendants are then passed on to the IPAs, including Plaintiffs, which are required to bear the ultimate economic burden of the artificially inflated prices through the detrimental effect on their capitation payments. Plaintiffs seek to recover all damages to which they are entitled as a result of Defendants' unlawful, anticompetitive conduct.

## **PARTIES**

11.     Each Plaintiff is an IPA. IPAs are businesses comprised of a network of physicians who, through the combined efforts of the physicians in each IPA, are able to provide a diverse array of services to their beneficiaries.

12.     Plaintiff SISO is a limited liability company organized under the laws of Puerto Rico with its main office located in Isabela, PR. None of the members of SISO is a citizen of the any state in which any Defendant has its principal place of business or in which any Defendant is incorporated.

13.    Plaintiff ECMS is a corporation organized under the laws of Puerto Rico with its principal place of business located in Fajardo, PR.

14.    Plaintiff Costa Corp. is a corporation organized under the laws of Puerto Rico with its principal place of business located in Fajardo, PR.

15.    Plaintiff Costa, L.L.C. is a limited liability company organized under the laws of Puerto Rico with its main office located in Fajardo, PR. None of the members of Costa, L.L.C. is a citizen of any state in which any Defendant has its principal place of business or in which any Defendant is incorporated.

16.    Plaintiff FMG is a corporation organized under the laws of Puerto Rico with its principal place of business located in Carolina, PR.

17.    Defendant Eli Lilly manufactures, promotes, and sells several analog insulin medications, including Humulin N, Humulin R, Humalog, and Basaglar, all of which are provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the Plaintiffs for their beneficiaries. Each Plaintiff has purchased and/or paid for at least one of the analog insulin products manufactured by Eli Lilly. Moreover, Eli Lilly employs sales representatives in Puerto Rico to promote and sell insulin products. Eli Lilly also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico. Eli Lilly is an Indiana corporation with its principal place of business in Indiana. Upon information and belief, Eli Lilly is not a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

18.    Defendant Novo Nordisk manufactures, promotes, and sells several analog insulin medications, including Novolin R, Novolin N, Novolog, Levemir, and Tresiba, all of which are

provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the Plaintiffs for their beneficiaries. Each Plaintiff has purchased and/or paid for at least one of the analog insulin products manufactured by Novo Nordisk. Novo Nordisk employs sales representatives in Puerto Rico to promote and sell insulin products. Novo Nordisk also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico. Novo Nordisk is a Delaware corporation with its principal place of business in New Jersey. Novo Nordisk is registered to do business in Puerto Rico. Upon information and belief, Novo Nordisk is not a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

19.     Defendant Sanofi manufactures, promotes, and sells several analog insulin products, including Lantus, Toujeo, Soliqua, and Apidra, all of which are provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the Plaintiffs for their beneficiaries. Each Plaintiff has purchased and/or paid for at least one of the analog insulin products manufactured by Sanofi. Sanofi employs sales representatives in Puerto Rico to promote and sell Lantus, Toujeo, Soliqua, and Apidra. Upon information and belief, Sanofi also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico. Sanofi is a Delaware limited liability company with its principal place of business in New Jersey. Upon information and belief, none of the members of Sanofi is a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

20.     Defendant CVS Caremark is a Delaware limited liability company that maintains its principal place of business in Rhode Island. Upon information and belief, none of the members of CVS Caremark is a citizen of the same state as any member of Costa, L.L.C. and/or SISO. At

all times relevant to this Complaint, CVS Caremark entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto Rico and the placement of their drugs on CVS Caremark's formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico. Upon information and belief, CVS Caremark is not a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

21.    Defendant Express Scripts is a Delaware corporation that maintains its principal place of business in Missouri and is registered to do business in Puerto Rico. At all times relevant to this Complaint, Express Scripts entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto Rico and the placement of their drugs on Express Scripts' formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico. Upon information and belief, Express Scripts is not a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

22.    Defendant OptumRx is a California corporation that maintains its principal place of business in California and is registered to do business in Puerto Rico. At all times relevant to this Complaint, OptumRx entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto Rico and the placement of their drugs on OptumRx's formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico. Upon information and belief, OptumRx is not a citizen of the same state as any member of Costa, L.L.C. and/or SISO.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiffs and Defendants and each Plaintiff's claim exceeds $75,000.00, exclusive of interest and costs.

24.     Venue is proper in this district because Defendants are located, reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c).

## FACTUAL ALLEGATIONS

### I.    The Prevalence and Treatment of Diabetes in Puerto Rico

25.     Approximately 37 million people suffer from diabetes nationwide, including more than 430,000 people in Puerto Rico (approximately 20% of Puerto Rico's population).

26.     Diabetes is a deadly disease. Left untreated, people with type 1 diabetes may suffer ketoacidosis, which can cause complications such as brain swelling, cardiac arrest, and kidney failure, while those with type 2 diabetes may suffer from heart disease, kidney disease, nerve damage, and other chronic conditions that could lead to premature death.

27.     Regular injections of insulin effectively treat diabetes. The first insulins were extracted from animals more than 100 years ago. In the early 1980s, the first biosynthetic human insulin, known as Humalin, was licensed to Eli Lilly. Novo Nordisk later launched another human insulin called Novolin. The development of these drugs led to a decline in the use of animal-derived insulins, which were later removed from the United States market. In the 1990s and early 2000s, researchers developed analog insulins, which are modified to account for the human body's natural pattern of insulin release. In the United States, the majority of patients use analog insulin—e.g., Humalog (Eli Lilly), Novolog (Novo Nordisk), Apidra (Sanofi), Lantus (Sanofi), and Levemir

(Novo Nordisk)—rather than human insulin. As of 2018, analog insulins accounted for 91% of insulin volume and 92% of insulin sales in the United States. Upon information and belief, analog insulins account for similar volume and sales levels in Puerto Rico.

28.     Insulin is also categorized based on how rapidly it takes effect and for how long it lasts. People suffering from diabetes typically take a combination of rapid-acting, short-acting, intermediate-acting, and long-acting insulins to control their glucose levels. For example, rapid-acting analogs may be used before mealtime to control spikes in blood sugar following the meal, while long-acting analogs may be used once or twice a day and overnight to help with glucose control.

29.     In helping patients manage their glucose levels, insulin treats diabetes and saves countless lives. However, over the past 25 years, the price of insulin has skyrocketed, leaving many patients unable to afford, or forced to underuse, this life-saving treatment.

30.     But it was not always this way. More than 100 years ago, when researchers developed animal-derived insulin injections to treat diabetes for the first time, those researchers famously assigned their patent rights in the drug to the University of Toronto for $1 each, so that "the method of preparation . . . would be free to prepare the extract" and that "no one could secure a profitable monopoly" over this life-sustaining drug. And for some time that was largely true. For example, up until 1999, one vial of Eli Lilly's Humalog listed for no more than $21 in the United States. As of 2019, that same vial cost more than $330, reflecting a price increase of more than 1000%.

31.     The troubling phenomenon of sky-rocketing insulin prices is unique to the United States. The most commonly used forms of analog insulin now cost 10 times more in the United States than in any other developed country. These astronomically high prices are no mistake:  they

are the result of conscious, concerted activity by the Manufacturing Defendants and the PBM Defendants to exploit their respective and combined market power by raising prices to, and maintaining prices at, an artificially high level that guarantees sustained and otherwise-economically-unavailable profits for both groups of Defendants.

**II.      The Supply Chain for Analog Insulin Drugs.**

32.    The supply chain for analog insulins in Puerto Rico is comprised of many different players, including manufacturers, wholesalers, pharmacies, PBMs, insurers, and IPAs, including Plaintiffs. The price paid by Plaintiffs is affected at each step of the chain.

33.    The Manufacturing Defendants sit at the top of the supply chain and together control approximately 95% of the market (both in the United States and, upon information and belief, in Puerto Rico specifically) for manufacturing analog insulin drugs. Drug manufacturers, including the Manufacturing Defendants, are solely responsible for determining the "wholesale acquisition cost" or "WAC" price for the drugs they manufacture. The WAC is also known as the "list price" or the "benchmark price."[1]

34.    Wholesalers purchase analog insulin drugs directly from the manufacturers, including the Manufacturing Defendants, at a negotiated discount from the WAC. Wholesalers then distribute those drugs to pharmacies, physicians, hospitals, and other customers.

35.    PBMs, including the PBM Defendants, administer prescription drug benefits on behalf of health insurers and other payers. In doing so, PBMs generate drug formularies (or lists) of prescription drugs covered by health plans that further provide the cost-share amounts that individual consumers must pay for their prescriptions. Typically, these drug formularies are

---

[1] "Wholesale acquisition price," "WAC," "list price," and "benchmark price" are used interchangeably herein.

divided into tiers, and drugs on the lower tiers have lower cost-share amounts. Manufacturers have strong financial incentive to gain placement on the PBM's drug formularies, because (among other reasons) placement on those formularies dictates whether the manufacturer's drug will be sold to the consuming public. Manufacturers have even more of an incentive to secure placement of their products on a lower tier, because the individual consumer's out-of-pocket contribution is lower for those products and consumers are accordingly more likely to want to buy those drugs.

36.     The financial incentives are especially strong with analog insulin. Despite being a product that has existed and been distributed for decades, the product is a huge revenue- and profit-driver for the Manufacturing Defendants. In 2016, Eli Lilly's revenues companywide from Humalog alone were $2.84 billion, Novo Nordisk's revenues from Novolog were $3.03 billion, and Sanofi's revenues from Lantus were $6.98 billion.

37.     PBMs' drug formularies (and especially those of the PBM Defendants) are thus critical to a huge portion of each of the Manufacturing Defendants' revenue streams: without placement on those formularies, the Manufacturing Defendants would be largely unable to sell their analog insulin to the consuming public.

38.      In attempt to garner favor with the various PBMs (including especially the PBM Defendants), the Manufacturing Defendants have derived a system pursuant to which they pay PBMs substantial "rebates" for their products when sold. These rebates are a *quid pro quo*:  if a Manufacturing Defendant provides a good rebate to the PBM Defendant, the PBM Defendant will both place the Manufacturing Defendant's product on its drug formulary (thus opening access to pharmacies in general) and place the Manufacturing Defendant's product in a preferred tier on the drug formulary (thus increasing, through lower out-of-pocket contributions, the number of individual consumers who are likely to buy the particular analog insulin). This flow of funds (and

12

the other payments and negotiations associated with the insulin market) is depicted in overview form below. The IPAs sit at the bottom of this flow of funds, where they pay pharmacies for analog insulins at artificially high rates.



39.    The PBMs (including in particular the PBM Defendants) are incentivized to participate in this drug pricing scheme because of the additional revenues they receive from higher benchmark prices. The pricing employed by PBMs (including the PBM Defendants) is referred to as "spread pricing" and is a practice pursuant to which PBMs (like the PBM Defendants) retain a portion of the amount paid to them by health plans for drugs instead of passing the full amount to the retail pharmacy at which the individual consumer filled his or her prescription. PBMs (including PBM Defendants) actually profit *more* if the benchmark price increases quickly, including (for example) because of the effect of "price-protection" rebates paid by manufacturers (including the Manufacturing Defendants) to PBMs (like the PBM Defendants). As described in one report on the drug industry as follows:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are more common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [benchmark price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'. Durable benchmark price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles.[2]

40.    In other words, the result of this "price protection rebate arbitrage" is to create an incentive to continuously increase benchmark prices in order to increase the profits of PBMs (and the PBM Defendants, specifically) without diminishing the profits of drug manufacturers (and the Manufacturing Defendants, specifically). At the consumer level, however, the end result is simply a higher, artificially set price for a critical, life-saving product.

41.    To that end, IPAs, including Plaintiffs, bear the ultimate economic burden with respect to the pricing of analog insulin:  IPAs receive a set amount of funding per beneficiary for a set period of time (e.g., a sum certain for each fiscal quarter within a fiscal year) that is referred to as a capitation payment. The IPAs disburse funds from that capitation payment for services being provided for, or pharmaceuticals being purchased by, the IPAs' beneficiaries (i.e., the individual consumer). At the end of the set period of time (e.g., the end of a particular quarter), the

---

[2] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR (Oct. 5, 2016).

IPAs, including Plaintiffs, either retain a portion of the remaining capitation-payment balance as profit, or they bear a portion of the overage on the capitation-payment balance as a loss. Importantly, the amount paid by the IPA (including Plaintiffs) is tied to the benchmark price; they do not receive the benefit of any "price protection rebate arbitrage" or any other "rebates" received by the PBM. Thus, as it pertains to analog insulin, the artificially increased and created prices discussed herein have "squeezed" the margins associated with the IPAs' capitation payments: IPAs, including Plaintiffs, have received diminished profits, or have had to bear larger losses, because the prices for analog insulin paid by IPAs (including Plaintiffs) from the capitation payments are higher than would otherwise be the case in a competitive marketplace.

42.    Plaintiffs do not pass on any of the amounts they pay for the artificially priced insulin and instead bear those costs themselves. Each Plaintiff has accordingly incurred hundreds of thousands (and potentially millions) of dollars in damages from its purchase of each analog insulin product manufactured by the Manufacturing Defendants.

### III.    Each of the Manufacturing Defendants and the PBM Defendants dominate their respective markets and have wielded their market power to inflate prices.

43.    The Manufacturing Defendants and the PBM Defendants enjoy oligopolies in their respective markets, in which few sellers dominate and in which high barriers to entry render it difficult, if not impossible, for new sellers to enter.

44.    The Manufacturing Defendants have used their market power to fix prices for analog insulin horizontally, as set forth below, with each increasing their respective products' benchmark prices in lockstep pursuant to an express or implicit agreement.

45.    The PBM Defendants have similarly used their market power to fix prices— through rebates and other price controls set forth in their contracts and other agreements with drug

manufacturers—by expressly or implicitly agreeing among themselves to increase the demanded amounts of rebates.

46.    The Manufacturing Defendants and PBM Defendants have also wielded their combined market power to agree, expressly or implicitly, to artificially increase prices that are passed on to end-purchasers, including Plaintiffs, who have no choice other than to pay the increased amounts.

**a.  The Manufacturing Defendants dominate the market for analog insulin.**

47.    With respect to the Manufacturing Defendants, and to the extent necessary to Plaintiff's claims, the relevant product market is for analog insulin drugs, and the relevant geographic market is Puerto Rico.

48.    The market for analog insulin drugs is highly concentrated. The Manufacturing Defendants manufacture the majority of insulin sold in the United States and abroad. As of 2020, the Manufacturing Defendants' global market shares were as follows:

| Manufacturer | Global Market Share (by volume) | Global Market Share (by revenue) |
|---|---|---|
| Eli Lilly | 23% | 23% |
| Novo Nordisk | 52% | 41% |
| Sanofi | 17% | 32% |
| **Total** | **92%** | **96%** |

On information and belief, the Manufacturing Defendants dominate the market for drug benefits in Puerto Rico in similar fashion. Each of the Manufacturing Defendants accordingly wields substantial market power, and, combined, the Manufacturing Defendants function as an oligopoly that, when working together through an implicit or explicit agreement, are able to act as price-setters that can sustain above-competitive profit levels indefinitely.

49.    The market for analog insulin is insulated by high barriers to entry. Though the patents for the majority of analog insulins have expired or are about to expire, the Manufacturing

Defendants continue to maintain patents for the pens and other devices that deliver insulin that are still in effect. The patent protection of these insulin devices serves as a *de facto* patent on the insulin drugs themselves. Each of the Manufacturing Defendants' pens and other delivery devices can be used with only that Manufacturing Defendants' brand of insulin. The lack of interoperability among devices and insulin delays competition in the analog insulin market and serves as a significant barrier to competitor entry.

50.     The Manufacturing Defendants readily recognize this and other high barriers to entry into the market for analog insulin:  for example, in a statement from 2019, Eli Lilly asserted in pertinent part: "There aren't many insulin manufacturers because . . . manufacturing insulin is scientifically and technically very precise, difficult, and requires billions of dollars in long-term investments. Companies have to make a long-term commitment to be in this industry. Not many are able or willing to do so." The start-up costs to manufacture insulin, obtain FDA approval, and create largescale distribution networks (including by reaching agreements with, for example, PBMs) are all significant barriers to entry that prevent new businesses from entering the competitive marketplace.

51.     Evidencing the difficulties faced by new entrants into the analog insulin market, though Viatris Inc. ("Viatris") and Biocon Biologics Ltd. ("Biocon") received FDA approval to manufacturer a biosimilar insulin in the United States, Viatris and Biocon have achieved only single-digit market share to date.

52.     Even more, demand for the Manufacturing Defendants' analog insulin drugs is highly inelastic because patients with diabetes require insulin to stay alive. This high price inelasticity allows Manufacturing Defendants to raise and maintain the price of the drugs substantially above marginal cost without losing so many sales as to make the price increase

unprofitable. This, along with the high barriers to entry into the market for analog insulin drugs and the consolidation of market share among the Manufacturing Defendants, provides the Manufacturing Defendants with significant market power in the market for analog insulin drugs in Puerto Rico.

**b. The Manufacturing Defendants have abused their market power and engaged in other anticompetitive conduct to artificially inflate the price of insulin.**

53.     Over the past twenty years, the Manufacturing Defendants have abused their market power to increase the list price of Manufacturing Defendants' analog insulins by more than 400%. The below chart reflects the increases from 2004 to 2022 of the "list" or "benchmark" price for four of the major analog insulin products (each of the which is manufactured by one of the Manufacturing Defendants):



54.     The Manufacturing Defendants' increases in the benchmark prices for analog insulins have proceeded in lockstep. For example, the below chart reflects that, from 2001, when Novo Nordisk launched Novolog, its list price increased in tandem with that of Humalog, which is manufactured by Eli Lilly:



The same is true of Lantus, manufactured by Sanofi, and Levemir, beginning when Novo Nordisk launched the drug in 2006:



55.    Upon information and belief, the prices of Manufacturing Defendants' analog insulins in Puerto Rico have similarly increased in lockstep.

56.    The increases in the list price for Manufacturing Defendants' analog insulins have outmatched both inflation and the price of other consumer goods, in the United States as a whole (as depicted below) and, upon information and belief, in Puerto Rico in particular:



57.    In this way, the Manufacturing Defendants have artificially inflated and fixed list prices for their insulin products while maintaining profit margins. For example:

- Eli Lilly increased the WAC price for its rapid-acting insulin, Humalog 5050 Kwikpen, from $323 in 2013 to $530 in 2017—an increase of $207 (or 64%) in four years;

- Novo Nordisk increased the WAC price for its long-acting insulin pens, Levemir FlexTouch, from $303 in May 2014 to approximately $462 in January 2019—an increase of $159 (or 52%) in a little more than five years; and

- Sanofi increased the WAC price for its long-acting insulin pens, Lantus Solostar, from $303 in 2014 to $404 in 2019—an increase of $100 (over 33%) in 5 years.

58.    The increases in the benchmark price of analog insulins in the United States, which is mirrored in Puerto Rico, far exceed the cost to manufacture the drugs. According to some research, it costs roughly $2 to $4 to produce a vial of analog insulin—hundreds of times less than the average list price in the United States (and in Puerto Rico, specifically).

59.    Nor are the price increases justified by an increase in efficacy or other enhancement to the drugs, evidenced by the fact that the amounts spent by the Manufacturing Defendants on research and development are dwarfed by other line items in their budgets. For example, Eli Lilly reported spending $395 million on research-and-development costs for Humalog, Humulin, and Basaglar between 2014 and 2018, during which time the company spent nearly $1.5 billion on sales and marketing expenses for the drugs.

60.    In sum, the increases in benchmark price for the Manufacturing Defendants' analog insulins cannot be explained by research-and-development expenses, expenses to improve the efficacy of the drugs or their manufacture, or other justifiable reasons. These price increases instead result from the Manufacturing Defendants' ability to control, and artificially inflate, the list prices of their analog insulins and their coordination with one another to maintain those excessively high prices, evidenced by: (a) the fact that no Manufacturing Defendant lowered the price of their brand-name analog insulins in response to the introduction of biosimilars and generic drugs into the market; (b) the inability of those biosimilars and generic drugs to meaningfully compete in the market; (c) the excessive gross margins on analog insulins that the Manufacturing Defendants have enjoyed for the past twenty years; and (d) perhaps most tellingly, a similarly coordinated decrease in the price of insulin in response to government actions and/or public pressure, all in March of 2023.

**c. The PBM Defendants dominate the market for PBM services.**

61.    With respect to the PBM Defendants, and to the extent necessary to Plaintiff's claims, the relevant product market is for PBM services (including especially the creation and administration of drug formularies), and the relevant geographic market is Puerto Rico.

62.    Unique to the United States, PBMs, including the PBM Defendants, are administrators hired by third-party payers, such as government entities or insurers, to design and administer prescription drug programs. In doing so, the PBM Defendants compile "drug formularies" setting out the prescription drugs covered by insurance plans and the co-payments and other cost-sharing amounts borne by consumers under those plans. PBMs also maintain a network of pharmacies where beneficiaries can fill prescriptions and negotiate and process payments to pharmacies for the drugs dispensed.

63.    The PBM Defendants dominate the PBM market in the United States. The PBM Defendants' market shares in the United States were recently calculated as follows:

| PBM | Percentage of Claims Administered | Percentage of U.S. Population Covered |
|---|---|---|
| CVS Caremark | 34% | 32% |
| Express Scripts | 24% | 24% |
| OptumRx | 21% | 20% |
| **Total** | **79%** | **76%** |

On information and belief, the PBM Defendants dominate the market for drug benefits in Puerto Rico in similar fashion.

64.    The PBM market was not always so consolidated. As recently as 2000, there were more than 40 PBMs operating in the United States. After merging with or acquiring their competitors, the PBM Defendants have cannibalized the PBM market and now control 80% of prescriptions for more than 270 million Americans:



65.    Among other things, the consolidation of the market—and the corresponding consolidation of potential clients and contracts—as well as pharmacy networks and various network effects have led to significant barriers to entry for any potential competitors. The PBMs (including especially the PBM Defendants) rely on their significant number of beneficiaries and clients to assert leverage in their negotiations with Manufacturing Defendants, and it is difficult (if not impossible) for a start-up PBM to compete with the established PBMs (including especially the PBM Defendants). Thus, the PBM Defendants, like the Manufacturing Defendants, are oligopolistic firms with substantial market power that can accordingly artificially set prices (here, in the form of demanded rebates) for an extended period of time without concern for new competition or decreased sales or profits.

**d. The PBM Defendants have abused their market power and engaged in other anticompetitive conduct to artificially inflate the price of insulin.**

66.     The PBM Defendants generate profits in two ways:  (1) service and administrative fees; and (2) rebates for each sale of a drug listed on the PBM Defendants' formularies, paid by the drug's manufacturer and equal to a percentage of the drug's WAC. Prescription drug rebates are reductions from the WAC (or list) price redeemed from manufacturers after the transaction. Yet, unlike traditional rebates, manufacturers pay prescription drug rebates to the PBM Defendants, not to the parties (i.e., Plaintiffs) who paid the WAC price (or a price closely associated with the WAC price).

67.     By virtue of the PBM Defendants' dominance in the PBM market, inclusion of a prescription drug on the PBM Defendants' drug formularies is critical to drive the volume and number of sales of that drug. As Eli Lilly explained to its investors in 2019, exclusion from a PBM Defendant's formulary can "lead to reduced usage of a drug for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to preferred co-pay tiers, increased co-insurance levels, and higher deductibles."

68.     But it need not be that way. Where (1) two or more drug companies manufacture drugs in the same therapeutic class, with similar effectiveness and risk profiles, and (2) the cost of manufacturing the drug is low—both of which conditions apply with respect to the Manufacturing Defendants' analog insulins—the rebates provide leverage to the PBM Defendants to negotiate lower prices for consumers. The PBM Defendants could require that the manufacturers compete for access to their formularies by lowering the WACs for their drugs, but they do not.

69.     Instead, the PBM Defendants negotiate higher and higher rebates from manufacturers. Indeed, smaller rival PBMs with nominal market shares and little-to-no bargaining power are offered less generous rebates, discounts, and other fees by manufacturers compared to

the PBM Defendants. For example, an internal Sanofi memo documents rebate negotiations with WellDyneRX, a small competitor of the PBM Defendants, for some of Sanofi's analog insulin drugs. Noting that WellDyneRX "is a PBM with ~ 1M lives," (compared to, for example approximately 16 million lives covered by Defendant CVS Caremark at the time), Sanofi offered WellDyneRX rebates ranging between 40% and 50% for the drugs, while offering CVS Caremark rebates up to 72%.

70.    The PBM Defendants also *exclude* drugs from their formularies in order to procure high rebates from manufacturers. Defendants CVS Caremark, Express Scripts and OptumRx began excluding drugs from their formularies in 2012, 2014, and 2016, respectively.  In that time, insulins have been one of the PBM Defendants' most frequently excluded drugs:

**Figure 5.** Number of insulins excluded from 1 or more formulary, by year and PBM

71.    The PBM Defendants purport that these exclusions serve to control costs, by excluding higher-cost drugs in place of lower-cost alternatives. The opposite is true. Manufacturers typically offer rebates only for branded drugs, not generics. Typically, branded drugs account for a small percentage of drug utilization but the vast majority of drug spending. For example, for Plan

Vital (the Puerto Rico government health plan), the branded drug utilization rate is less than 10%, but branded drugs account for approximately 80% of drug spending.

72.    Specifically relevant here, the PBM Defendants' exclusions target lower-list-price insulins, such as authorized generic insulins,[3] some of which list at prices half of their brand name equivalents. More recently, when the first two identical biosimilar insulins[4] were simultaneously launched in 2021—one with a higher list price and large rebates and one with a lower list price and limited rebates—the PBM Defendants excluded the lower-list-priced version, choosing instead to include the identical product with a higher list price on their formularies.

73.    These exclusions are not outliers. Two out of every three biosimilar products are excluded by one of the PBM Defendants. Nor are these exclusions evidence-based, as often a product or prescription drug will be preferred on one PBM Defendant's formulary but excluded on another's.

74.    With their market power, combined with their exclusionary practices, the PBM Defendants have reaped unprecedented profits, as the rebates paid by drug manufacturers to the PBM Defendants have more than doubled over the past decade.[5] The proceeds from those rebates, along with attendant fees, have skyrocketed, totaling more than $27.5 billion in profits for the PBM Defendants in the last year, alone – a 483% increase over the past decade.

---

[3] An authorized generic medicine is a brand name drug that is marketed without the brand name on its label. Even though the authorized generic is the same brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug.

[4] A biosimilar is an FDA-approved biologic that is highly similar to, and has no clinically meaningful difference from, another biologic that is already FDA-approved (referred to as the reference product or original biologic). Biosimilars are generally lower priced than their existing biologic counterparts.

[5] For example, Sanofi increased its rebates from 2-4% in 2013 to 56% in 2018.

75.    By indirectly driving up the WACs of analog insulin through their rebate scheme, the PBM Defendants' practices have increased the costs of those drugs—including the Manufacturing Defendants' analog insulins—to Plaintiffs. As this chart depicts, for prescription drugs sold from 2016 to 2018, on average, a $1 increase in rebates was associated with a $1.17 increase in the WAC price.



76.    The PBMs have effectively exploited their market power to demand higher rebates from the Manufacturing Defendants, which in turn use their market power to pass the rebate amounts on to the ultimate payors, including (as pertinent here) IPAs, including Plaintiffs.

**IV.    The Manufacturing Defendants and the PBM Defendants coordinate to further artificially inflate analog insulin prices.**

77.    For more than a decade, the Manufacturing Defendants and the PBM Defendants have agreed, either explicitly or implicitly, to steadily increase the WAC for the Manufacturing Defendants, in turn increasing the rebates to the PBM Defendants. More specifically, the PBM Defendants and the Manufacturing Defendants have agreed to increase their profits by putting analog

insulin products on their formularies that have the highest WACs and the most generous rebates to the PBM Defendants.

78.    This pricing scheme (the "Insulin Pricing Scheme") is built into the contracts between the Manufacturing Defendants and the PBM Defendants. Though the rebates that the PBM Defendants negotiate are highly confidential and the exact terms of the agreements between PBMs and prescription drug manufacturers are reportedly unknown to others in the supply chain, it is now established that the contracts provide "price protection," triggering additional rebate payments to the PBM Defendants whenever a Manufacturing Defendant raises the WAC beyond a certain amount.

79.    Even more, the PBM Defendants are aware of their oligopolistic power, the prevalence of rebates in the industry, the lockstep increases in the Manufacturing WACs, and the increased profits experienced by each of the PBM Defendants. Even if the PBM Defendants are not aware of each other's rebates (or increasing their own rebates to match the other PBM Defendants' rebates) dollar for dollar, they are aware of (and are agreeing, implicitly or expressly, to) the general range of increased prices and rebates.[6]

80.    The Defendants have coordinated through other channels, as well. For example, each Manufacturer Defendant is a member of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA"). Executives from each of the Manufacturing Defendants sit, and have sat for many years, on PhRMA's board of directors. Currently, David Ricks, the Chairman and CEO of Eli Lilly; Paul Hudson, the CEO of Sanofi; and Douglas Langa, the President of Novo Nordisk, serve on the PhRMA board. The Manufacturing Defendants are believed to have routinely

---

[6] The nature of this price-fixing is perhaps most aptly illustrated by the fact that the PBM Defendants reportedly exist to negotiate *decreased* prices for drugs. If any of the PBM Defendants had operated as they were created to operate, they would have used their leverage to effect lower prices for drugs; rather, they have each, through implicit or express agreement with the others, insisted on higher rebates, which increase their profits at the expense of their beneficiaries.

communicated through PhRMA meetings in furtherance of their artificial inflation of analog insulin WACs, through their lockstep price increases and the Insulin Pricing Scheme.

81.     The PBM Defendants, too, are members of an industry-funded trade organization, the Pharmaceutical Care Management Association ("PCMA"), which holds several yearly conferences, annual meetings, and business forums. Executives from each of the PBM Defendants sit, and have sat for many years, on PCMA's board. Currently, the PCMA board is comprised of, among other executives in the industry, Adam Kautzner, the President of Express Scripts; David Joyner, an Executive Vice President at CVS Health, which operates CVS Caremark; and Heather Cianfrocco, the CEO of OptumRx. The PBM Defendants are believed to have routinely communicated through PCMA meetings in furtherance of their artificial inflation of analog insulin WACs, through their rebates and the Insulin Pricing Scheme.

82.     The Manufacturer Defendants are affiliate members of the PCMA and, for at least the last eight years, have been "Partners," "Platinum Sponsors," or "Presidential Sponsors," of PCMA conferences. The conference portrays "private meetings" between its members—and especially executives from manufacturers like the Manufacturing Defendants and from PBMs like the PBM Defendants—for the purpose of "conduct[ing] onsite business meetings" as "a core value" of the conference.

83.     PCMA also hosts PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." The Manufacturing Defendants and the PBM Defendants are believed to have used PCMA-Connect and conference meetings to facilitate the exchange of information and otherwise reach agreements in furtherance of the Insulin Pricing Scheme.

84.    The Manufacturing Defendants and the PBM Defendants are believed to regularly communicate by way of PhRMA and PCMA platforms and meetings in furtherance of the Insulin Pricing Scheme, evidenced by the timing of the Manufacturing Defendants lockstep price increases.

85.    For example, on September 26 and 27, 2017, the PCMA held its annual meeting, and each of the Manufacturing Defendants hosted private meeting rooms. Executives from each Defendant are believed to have engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

86.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus. This price increase occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C., which was attended by representatives from all Defendants.

87.    The Manufacturing Defendants' internal documents further confirm their coordination with the PBM Defendants in furtherance of the Insulin Pricing Scheme. For example, in an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.

88.    Consistent with this evidence, and upon information and belief, the Insulin Pricing Scheme is a coordinated effort between the Manufacturing Defendants and the PBM Defendants.

The Manufacturing Defendants and the PBM Defendants are believed to be in frequent communication and regularly meet and exchange information to construct and refine the PBM Defendants' formularies that form and fuel the scheme. As part of these communications, the Manufacturing Defendants are believed to be directly involved in determining not only where their own analog insulin products are placed on the PBM Defendants' formularies, but also in the placement and treatment of the analog insulin products manufactured by other insulin manufacturers.

89.     For the past decade, the Defendants' Insulin Pricing Scheme has succeeded, as the Manufacturing Defendants have raised prices in unison and have paid correspondingly larger rebate payments to the PBM Defendants. In exchange for the Manufacturing Defendants' artificially inflating their prices and paying the PBM Defendants substantial amounts in rebate payments, the PBM Defendants grant the Manufacturing Defendants' analog insulin products preferred status on their formularies. During the relevant period, the rebate amounts paid to the PBM Defendants (as a proportion of the WACs) and the WACs set by the Manufacturing Defendants for their analog insulins increased in tandem.

90.     The end result of these unlawful combinations or agreements in restraint of trade, including horizontal price-fixing (between the Manufacturing Defendants, as to their WACs, and between the PBM Defendants, as to their rebates) and vertical price-fixing (between the PBM Defendants and Manufacturing Defendants), is to create an artificially high WAC that is borne by the Plaintiffs.

91.     Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause artificial prices for the at-issue drugs.

Plaintiffs have been overcharged, and sustained significant damages in paying for, Manufacturing Defendants' analog insulin drugs.

### COUNT ONE
### UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258
### BY THE MANUFACTURING DEFENDANTS

92.     Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

93.     The Manufacturing Defendants' conduct violates Section 258 of the PRAA, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico." 10 L.P.R.A. § 258.

94.     The Manufacturing Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or combinations to artificially increase in lockstep the WAC for their respective brand-name analog insulins.

95.     These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiffs. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

96.     Plaintiffs have been harmed by the Manufacturing Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to suffer, damages, including but not limited to increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

97.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to their businesses caused by the Manufacturing Defendants' anti-competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**COUNT TWO**
**UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258**
**BY THE PBM DEFENDANTS**

98.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

99.    The PBM Defendants' conduct also violates Section 258 of the PRAA.

100.    The PBM Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or combinations to set rebates (and thus, ultimately, the WACs) for the Manufacturing Defendants' analog insulin products.

101.    These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiffs. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

102.    Plaintiffs have been harmed by the PBM Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to suffer, damages, including but not limited to increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

103.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to their businesses caused by the PBM Defendants'

anti-competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT THREE
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258
## BY THE MANUFACTURING DEFENDANTS AND THE PBM DEFENDANTS

104.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein

105.    Combined, the Manufacturing Defendants and the PBM Defendants' conduct violates Section 258 of the PRAA.

106.    The Manufacturing Defendants and the PBM Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or combinations in furtherance of the Insulin Pricing Scheme.

107.    These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiff. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

108.    Plaintiffs have been harmed by the Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to suffer damages, including, but not limited to, increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

109.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to its business caused by the Defendants' anti-

competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that, after due proceedings are had, the Court issue an Order:

A. Declaring Defendants' conduct as described herein above to be in violation of the PRAA;

B. Permanently enjoining Defendants and all other persons acting on their behalf, directly or indirectly, from violating the PRAA;

C. Directing Defendants to pay all damages and other remedies to Plaintiffs as a result of the acts and practices alleged in this Complaint and any other acts or practices proved by the Plaintiffs pursuant to 10 L.P.R.A. § 268;

D. Directing Defendants to pay the Plaintiffs' litigation costs in this matter pursuant to 10 L.P.R.A. § 268; and

E. Awarding any and all other relief as may be just and equitable.

Dated: July 3rd, 2023

**[Signatures on Following Page]**

Respectfully submitted,

*/s/ Harold D Vicente-Colon*
Harold D. Vicente-Colón
USDC-PR 211805
Vicente & Cuebas
Capital Center Sur Ph1-1201
239 Arterial Hostos
Hato Rey
Tel. (787) 751-8000
Fax (787) 756-5250
hdvc@vclawpr.com

*/s/ Heriberto Lopez-Guzmán*
Heriberto López Guzmán
USDC-PR 224611
H. Lopez Law, L.L.C.
Metro Office Park
Lot 11, Suite 105A
Guaynabo, Puerto Rico 00968
Tel: (787) 422-0243
hlopez@hlopezlaw.com

Jason W. Burge (to be admitted *pro hac vice*)
Michael R. Dodson (to be admitted *pro hac vice*)
C. Hogan Paschal (to be admitted *pro hac vice*)
FISHMAN HAYGOOD, LLP
201 St. Charles, 46th Floor
New Orleans, LA 70170
Telephone: (504) 585-5252
Facsimile: (504) 586-5250
jburge@fishmanhaygood.com
mdodson@fishmanhaygood.com
hpaschal@fishmanhaygood.com

*Counsel for Plaintiffs*